# EXHIBIT D

NEWS

# SUING THE STREET

BY **NEWSWEEK STAFF** ON 12/5/04 AT 7:00 PM EST

NEWS

The phone call brought troubling news for top executives at Bear Stearns. A few years ago the law firm of Leeds, Morelli & Brown said approximately 50 minority employees at Bear Stearns were ready to sue, possibly as a class, claiming they'd been passed over for promotions because of their race. Leeds, Morelli wanted $25 million, and threw in an incentive: the alleged victims would agree to sign a waiver to drop any future legal action. To add pressure, Leeds, Morelli brought in legendary class-action attorney Melvyn Weiss, known for extracting huge awards out of companies, for settlement talks. Bear Stearns had plenty of reasons to want to make the case go away. Discrimination on Wall Street of any kind--racial, sexual or cases involving age--has become a high-profile and costly issue in recent years, leading to nightmare headlines and huge settlements. In the end Bear Stearns agreed to pay $2 million, and it believed that was the last it would hear from Leeds, Morelli. But the firm came calling again, extracting yet another settlement out of Bear Stearns, based on similar allegations from a different group of workers.

With its hardball approach in pressing discrimination claims, Leeds, Morelli, a small firm with just 15 lawyers, based in Carle Place, Long Island, has become a quiet but powerful foe of Wall Street. NEWSWEEK has learned that the firm, employing some of the same tactics it used against Bear Stearns, has in recent years won tens of millions of dollars in settlements by targeting many of the biggest firms on the Street, including Prudential Securities, JPMorgan Chase, Salomon Smith Barney and the Bank of New York, according to people familiar with Leeds, Morelli's actions. The cases are kept confidential as part of the settlement deals, so nobody at those firms was willing to be quoted by name for this article. Another sign of Leeds, Morelli's impact is that a once obscure line of insurance known as "employment-practices liability"--to guard against discrimination cases--has exploded in popularity, and risen sharply in price. An executive at the Chubb Group of Insurance Companies said Leeds, Morelli was a big reason for the jump.

Nobody disputes that Leeds, Morelli is capitalizing on a longstanding problem: the small number of minorities in the brokerage business, as well as the relatively few women in management. Many Wall Street executives say they're trying to rectify the shortcomings. But those same executives are sharply critical of Leeds, Morelli's methods--which include asking current clients for names of other potential victims at their firms. They say such tactics invite abuse, because people who think they might get a big payoff may lend their name to an existing or future claim. That creates, they say, an incentive to see bias where it doesn't exist. "These guys are the worst," says one Wall Street executive who has dealt with Leeds, Morelli. "They're shakedown artists."

The partners of Leeds, Morelli, publicly discussing their business practices for the first time, say the criticism is merely a sign of the firm's progress. "It's like David against Goliath," says Lenard Leeds, a founding partner. He says Wall Street remains a fertile area for discrimination suits because the industry is still overwhelmingly

white and male. Nearly 78 percent of all positions in the brokerage industry are held by white workers, according to recent statistics from the Equal Employment Opportunity Commission; black employees hold 9 percent of the jobs, while Asians and Hispanic workers hold the rest. Wall Street has hired more women--they make up 42 percent of the work force, the EEOC says--but its management ranks are still overwhelmingly male. "The statistics," Leeds says, "don't lie."

Leeds also says his firm helps clients who may not have the means to hire a lawyer (Leeds, Morelli works on contingency). And by comparison, he added, other avenues for complaints can be time-consuming. The EEOC has received nearly 79,500 discrimination complaints this year, but filed only 378 lawsuits (it also mediates many disputes). "We've brought more of these cases over the past 20 years than anybody and we represent people who don't have 10 cents and can't pay us anything," says Leeds. "Clients are generally thrilled because instead of waiting eight years for money, we cut to the chase."

But not all of them are thrilled. Many former clients of Leeds, Morelli, all of whom worked at Prudential Securities, are suing the law firm, saying Leeds, Morelli's modus operandi is to cut a lot of quick settlements, and that the strategy has shortchanged them but made the firm's partners very rich. "They said I had a million-dollar case," says Brian Hodge, a former Prudential Securities back-office employee who says he trained less-experienced white employees who were then promoted over him. "But in the end, I received $100,000, and they got a third." The suit also claims that Leeds, Morelli had a deal in which Prudential paid millions in fees that weren't disclosed, lowering their award. Hodge's lawyer, Angela Roper, says Leeds, Morelli puts its own interests above its clients', and "undermines the spirit of anti-discrimination laws."

Leeds said the many settlements his firm has won from Wall Street are fair to all parties, but declined to discuss details of how much money it's earned in recent years. One measure of its success is that Hofstra University, the alma mater of partners Leeds and Jeffrey Brown, named an atrium in its law school after the firm following a series of donations (Brown, 33, joined the firm about seven years ago and heads its Wall Street practice; Leeds says he is taking more time to indulge his interest in singing, doing gigs at Long Island country clubs and weddings).

In an interview, Brown defended the firm's strategy for finding new clients as an effective means for rooting out discrimination. He confirmed that the firm has told its clerks that when they interview people who claim they're victims of discrimination, they should also ask for names of other potential victims. The clerks will often follow up on those leads by calling people who had never filed a claim. Hodge, the former Prudential employee, went to work for Leeds, Morelli after his case was settled, helping the firm find new clients. Hodge says he began to think twice about his job when he heard growing complaints that Leeds, Morelli was cutting quick settlements with Wall Street, making money off the volume of cases, while individual clients were getting only a sliver, sometimes as little as $5,000. Hodge then turned on his employer, joining the suit against Leeds, Morelli and Prudential Securities. "I can't get a job on Wall Street because I have Leeds, Morelli on my resume," he says.

Leeds, Morelli also once set up a not-for-profit group called "DOWS," which stood for Discrimination on Wall Street. The organization was operated by four employees who urged clients to donate 1 percent of their settlement money to the group. Brown says the purpose of the group, which worked out of the firm's New York City offices, was to offer support to victims of discrimination. In their suit, former clients of Leeds, Morelli say another role for DOWS was to generate names of potential new clients. Brown said that DOWS, which stopped operating several years ago, "produced zero clients" for the firm. Leeds, Morelli's strategy, he added, is "constantly evolving."

Another controversial way that Leeds, Morelli earns money: the firm, according to Wall Street executives, has said that one way to prevent further legal action would be to place Leeds, Morelli on a "retainer" of guaranteed, steady payments. Bear Stearns, one company that considered such a deal, declined. Brown says that such an arrangement may have been discussed with Bear Stearns, but that all such deals are disclosed to its clients. "We never raise the possibility [of a retainer], the firms do," Brown says. "They all know about it."

In their suit, the former clients of Leeds, Morelli say a similar deal existed with Prudential Securities, and represents a conflict of interest--the law firm may be less inclined to push for big settlements if it can make additional money through such agreements. Brown says it has a retainer deal with only one firm, which he wouldn't name because of their confidentiality agreement (though he did say the firm was not Prudential). Brown says his only goal is to help clients. "I put our settlements and track record up there with any civil-rights law firm in the country," he says.

It clearly wants to build on the record, in part by targeting companies outside Wall Street. In May, Leeds, Morelli filed an EEOC case against UPS, the big package-delivery company. The suit says UPS "steered" black and Hispanic drivers into more dangerous neighborhoods around New York City. UPS declined to comment. Where will Leeds go next? The firm won't say, but its partners make no secret of their ambitions. Steven Morelli, a founding partner, says, "It's tough to control us because we believe so much in what we're doing." For much of Wall Street, the problem is not what Leeds, Morelli is doing, but how.

**REQUEST REPRINT**, **SUBMIT CORRECTION** OR **VIEW EDITORIAL GUIDELINES**